UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NEW ENGLAND HEALTH CARE          :
EMPLOYEES UNION, DISTRICT        :
1199, SEIU,                      :
     Plaintiff         :
                                 :          Civil No. 3:05cv1540 (JBA)
v.                               :
                                 :
HAVEN HEALTHCARE MANAGEMENT,     :
     Defendant.        :

**RULING ON PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD [DOC.#1]**

     Plaintiff New England Healthcare Employees Union ("the Union") seeks to vacate an award rendered by arbitrator Jonas Aarons ("the Arbitrator") in an arbitration proceeding between itself and defendant Haven Healthcare Management ("Haven") on Sept. 26, 2005, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  For the reasons that follow, plaintiff's motion will be denied.

**I. FACTUAL BACKGROUND**

     In the spring of 2004, Haven was undergoing serious financial difficulties and wanted to renegotiate its agreement with the Union to alleviate financial problems. See Def.'s Mem. of Law [Doc. #9-2] at 2-3; Arbitrator's Op. at 2, Sept. 26, 2005, Ex. 2 to Pl.'s Mem. of Law [Doc. #1-2].  During the negotiations, Haven requested a moratorium on Pension Fund contributions, which the Union refused. Pl.'s Mem. of Law at 2; Def.'s Mem. of Law at 3.

     As a result of these negotiations, Haven and the Union

entered into a new collective bargaining agreement (the

"Agreement").  See Agreement, July 14, 2004, Ex. 1 to Pl.'s Mem.

The Agreement addressed the issue of Pension Fund contributions

in Paragraph 9:

> 9.   The Employer Pension Fund contribution rate for those
> facilities with the District 1199 Pension Fund shall be
> 8% effective June 1, 2004.  Furthermore, for the term
> of this agreement, the Employer shall have "most
> favored nation" status with regard to Pension Fund
> contributions and agreements entered into on or after
> May 19, 2004 by the Union and any Connecticut nursing
> home employer covered by the Fund, meaning that there
> shall be no increase to the Employer unless all other
> Connecticut Nursing Homes covered by the Fund with a
> contract entered into after May 19, 2004 are paying the
> increased amount.  Also, if at any time during the term
> of this Agreement the Union enters into a new agreement
> or amends an agreement with a Connecticut nursing home
> covered by the Fund and that agreement provides for a
> lower contribution formula, which did not exist prior
> to May 19, 2004, or a lower contribution rate than a
> Haven facility is paying, that lower contribution rate
> or formula shall apply to all Haven facilities with the
> District 1199 Pension Fund.  Haven shall have access to
> the Fund's records, as well as the records of the
> auditor's to verify the above.

Id. at 4.  After entering into the Agreement with Haven, the

Union entered into agreements with other Connecticut nursing home

employers, which contained moratoriums on Pension Fund

contributions from November 2004 to January 2006.  Arbitrator's

Op. at 3.

Upon learning of these agreements, Haven contacted the Union

by letter on January 13, 2005, stating that, in light of the

Agreement which granted it "Most Favored Nation" status, Haven

was "now contractually entitled to this same more favorable

2

condition, i.e. a zero contribution for at least the same fifteen (15) month period." Id. at 2-3.  In its response of January 18, 2005, the Union took the position that it did not agree "to a lower contribution rate or a lower contribution formula with other employers," but "agreed that certain employers could withdraw from the Pension Fund for a period of time." Id. at 4.

Haven and the Union submitted their contract interpretation dispute to arbitration as follows: "Whether under Paragraph 9 of the Agreement, the Employer is entitled to a moratorium of, and/or, to cease all pension contributions? And if so, for what period?" Id. at 1.  The Arbitrator awarded Haven a moratorium on its pension contributions for a period of 12 months.  Id. at 12. In addition to the award, "[i]n light of the circumstance that [Haven] has continued to make payments of pension contributions during the disputed periods involved," the Arbitrator retained jurisdiction "solely regarding remedy" for ninety days.  Id. at 11.

## II. STANDARD

Because the preferred method of labor-management dispute resolution is voluntary arbitration, the Court plays a limited role in the review of arbitral decisions. See Harry Hoffman Printing v. Graphic Comm. Int'l Union, Local 261, 950 F.2d 95, 98 (2d Cir. 1991).

"[A]s long as the arbitrator is even arguably construing or

applying the contract, that a court is convinced he committed serious error does not suffice to overturn his decision." Id. at 98 (citing United Paperworkers Int'l v. Misco, Inc., 484 U.S. 29, 38 (1987)).  The question for the Court is whether the award draws its essence from the agreement, since the arbitrator may not merely "dispense his own brand of industrial justice." In re Marine Pollution Serv., Inc., 857 F.2d 91, 94 (2d Cir., 1988) (citing United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 574, 599 (1960)).

But, "[m]erely because an arbitral decision is not based on the express terms of a collective bargaining agreement does not mean that it is not properly derived from the agreement." Harry Hoffman Printing, 950 F.2d at 98.  An arbitrator may "'take cognizance of contract principles'" to guide him or her in construing an agreement. Id. (citing GK Mgt., Inc. v. Local 274, Hotel Employees & Rest. Employees Union, 930 F.2d 301, 304 (3d Cir. 1991)).

"Courts are not empowered to reexamine the merits of an arbitration award, even though the parties to the agreement may argue that the award arises out of a misrepresentation of the contract or a factual error." Int'l Bhd. of Elec. Workers, Local 96 v. Niagara Mohawk Power Corp., 143 F.3d 704, 714 (2d Cir. 1998).  "Neither a misapplication of principles of contractual interpretation nor an erroneous interpretation of the agreement

4

in question constitutes grounds for vacatur." <u>Harry Hoffman Printing</u>, 950 F.2d at 99(<u>citing</u> <u>Misco, Inc.</u>, 484 U.S. at 38). The award cannot stand, however, if "'it is clear that the arbitrator '<u>must</u> have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference).'" <u>Id.</u> (<u>quoting</u> <u>Ethyl Corp. v. United Steelworkers</u>, 768 F.2d 180, 184-85 (7th Cir. 1985).

**III. DISCUSSION**

    A. <u>Essence of the Agreement</u>

    The Union argues that the Arbitrator substituted his own judgment for the agreement of the parties when he held that Haven was entitled to a one-year moratorium on its contribution to the Pension Fund, because (1) paragraph 9 of the Agreement made no reference to a moratorium and a moratorium had been rejected by the Union in negotiations; (2) Haven and the Union understood the word "moratorium" as they had used it in paragraph 14 of their Agreement; and (3) one of the Union's concerns during negotiations was that Haven employees continue to received Pension Fund credits.[1]

    In the Union's reading of the Agreement, Haven is provided only limited financial relief, in the form of a "lower contribution formula" or "lower contribution rate."  If, for

---

[1] The Union made these same arguments in its brief to the Arbitrator in opposition to Haven's position that it was entitled to a moratorium.  <u>See</u> Arbitrator's Op. at 5-6.

example, the Union were to make an agreement with another nursing home covered by the fund which provides "for a lower contribution formula, which did not exist prior to May 19, 2004, or a lower contribution rate than a Haven facility is paying," then that "lower contribution rate or formula" would apply to Haven as well. <u>See</u> Pl.'s Mem. of Law at 8.  The Union argues that since the relevant section of paragraph 9 makes no mention of any moratorium, the Agreement does not provide for such financial remedy.  In essence, the Union argues that the term "rate" must apply to a number greater than zero (0).  <u>Id.</u> at 7-8.  So, even if the Union were to agree to a moratorium with another nursing home, Haven would not be entitled to one.

The Union argues therefore that by awarding Haven the moratorium, the Arbitrator used his own understanding of "Most Favored Nation" to mean a "better deal" standard rather than the "lower rate" standard which was the limited remedy agreed upon by the parties in the Agreement.[2] <u>Id.</u> at 8.  According to the Union,

---

[2] The Union also relies on the Arbitrator's use of the first person to support its position that he was imposing his own private notion of what the parties had in mind when they bargained the Agreement (<u>e.g.</u> "it appears to me to provide;" "This is roughly what I read Paragraph 9 to provide;" "I do not believe this is what the parties intended, because it would defeat the very function of a 'most favored nation' clause as exemplified in Paragraph 9 of the collective bargaining agreement here in dispute."). Pl.'s Mem. of Law at 8.  This stylistic choice is of no moment as judges vary in their choice of voice, "I," "we," "the Court," etcetera.

such a reading runs counter to one of its concerns during negotiations – that Haven continue to make contributions to the Pension Fund.  Since the arbitration award eliminates such continuity, the Union argues that this result could not have been its intent when arriving at the Agreement. Id. at 9-10.

The Court finds that the Arbitrator's award does, however, draw its essence from the Agreement.  It utilizes numerous references to the language of the Agreement and the intent of the parties and makes its determinations based on accepted doctrines of contract interpretation. See Harry Hoffman Printing, 950 F.2d at 98.

In his Opinion, the Arbitrator offers his interpretation of the parties' intent behind Paragraph 9 of the Agreement.

> [I]t appears to me to provide that if the Union makes a new agreement or amends an old agreement with a Connecticut Nursing Home giving in effect a better deal to this other Connecticut Nursing Home than that which is enjoyed by Haven in regard to contributions to the Employer's Pension Fund, then the Union agrees that it will in effect match this better deal that it has made with the other Connecticut Nursing Home and extend the deal to Haven.

Arbitrator's Op. at 8-9.  The Union argues that since there is no mention of the word moratorium in Paragraph 9 (and the parties clearly understood the meaning of the word because they included it in Paragraph 14 which provides for Training Fund contributions), the Arbitrator improperly departed from the contract in deciding that the Union had intended to offer Haven "better deal" status.

7

In fact, the Arbitrator references the full text of paragraph 14 in his opinion and takes into account the Union's position that the "Most Favored Nation" clause applies only to the lowering of a contribution formula or rate and not a moratorium, but rejects that view, reasoning that such a reading would defeat the purpose of negotiating for "Most Favored Nation" status and would render the clause meaningless.[3]

> If the Union's position were to be upheld, then the Employer here would get no benefit from being the 'most favored nation' vis-a-vis other Connecticut Nursing Homes who were able to obtain an agreement with the Union regarding pension contributions to lower the pension contributions for a period of time to zero.  Under the Union's arguing position, if the agreements between the Union and the other Connecticut Nursing Homes were to stop short of zero, say in a very small percentage amount, then the Employer here should be successful, but because moratoriums were negotiated with the other Connecticut Nursing Homes, then the Employer here gets no benefit from Paragraph 9 of the agreement in dispute here.

Id. at 9-10.  The Union's final argument for its interpretation of "Most Favored Nation" status is that it had rejected Haven's demand for a moratorium during the negotiation process, in order to assure that its members would continue to receive pension

---

[3]The "most favored nation" clause is defined in the collective bargaining context as "[a]n agreement provision specifying that more favorable terms shall automatically be incorporated into the agreement, or that the employer is entitled to them.  The aim is to prevent competitors from gaining an advantage from more favorable terms.  Also called 'more favorable terms' clause." Harold S. Roberts, Roberts' Dictionary of Industrial Relations 485 (4th ed. 1994)(citing BNA, Collective Bargaining Negotiations & Contracts, 36:541).

credits.  The Union's insistence that it would never have jeopardized members' pension credits is somewhat belied by the fact that it subsequently bargained with other financially troubled nursing homes for moratoria on Pension Fund contributions.  Furthermore, the Arbitrator was sensitive to the unfortunate impact of his award on Union members:

> I do not make this decision lightly inasmuch as I am sympathetic to those employees whose pension benefits are involved in this matter.  However, I believe I have no choice given my reading of the collective bargaining agreement between the parties and the circumstances.

Id. at 11.  It is not for this Court to say whether the Arbitrator was correct or not in his interpretation of the parties' intent, other than to find no doubt that "his error [if any] was not in bad faith or so gross as to amount to affirmative misconduct," and therefore should not result in vacatur of the award.  Misco, Inc., 484 U.S. at 40 (holding that even if arbitrator's decision to exclude evidence was erroneous, court of appeals erred in refusing enforcement of arbitrator's award).

Thus, the Court finds no basis to vacate the award which is plainly derived from the Agreement.  The Arbitrator based his award on his interpretation of Paragraph 9 and what he determined to be the parties' intent regarding the meaning of the "Most Favored Nation" clause.

B. Finality

"An arbitration award is generally not final if it is not

intended by the arbitrators to be a complete determination of all
of the claims submitted to them." In re Arbitration between A/S
Siljestad and Hideca Trading, Inc., 678 F.2d 391, 391 (2d Cir.
1982) (citing inter alia Michaels v. Mariforum Shipping, S.A.,
624 F.2d 411, 413 (2d Cir. 1980)).

The Union argues that since the Arbitrator retained
jurisdiction for 90 days after issuing the award, the award is
not final and definite, and therefore not valid.  Pl.'s Mem. of
Law at 11.  It argues that by retaining jurisdiction over the
implementation of the remedy, the Arbitrator himself has
acknowledged that the award is not final and definite.  Id.

The Arbitrator retained jurisdiction "solely regarding
remedy," Arbitrator's Op. at 11, which does not render the award
not final and definite, if all that is left in applying the
remedy is "ministerial" detail, which could be "determined
automatically, without an exercise of judgment or discretion."
Dreis & Krump Mfg. Co. v. IAM District No. 8, 802 F.2d 247, 251
(7th Cir. 1986)

Here, the Arbitrator was charged with answering the
following questions: "Whether under Paragraph 9 of the Agreement,
the Employer is entitled to a moratorium of, and/or, to cease all
pension contributions?  And if so, for what period?" Arbitrator's
Op. at 1.  In his Award, he answered both questions, holding that
"[u]nder Paragraph 9 of the Agreement, the Employer [Haven] is

10

entitled to a moratorium of its pension contributions for a
period of 12 months." Id. at 12.

The Arbitrator retained jurisdiction for 90 days after the
date of the award "[i]n light of the circumstances that [Haven]
has continued to make payments of pension contributions during
the disputed periods involved here and there may therefore be
some dispute arising from these circumstances." Id. at 11.
Analogizing Haven's payments made during the disputed period to
backpay, it resembles the type of ministerial detail that is
automatically determinable from readily attainable evidence, and
requires no more judgment on the part of the Arbitrator.[4]

The Union further argues that the doctrine of functus
officio applies.  Once the Arbitrator has rendered his final
award, the Union argues, he has exhausted his power and any
further action on his part is void, including implementation of
the remedy.  Pl.'s Mem. of Law at 11-12.

"As a general rule, once an arbitration panel renders a
decision regarding the issues submitted, it becomes functus

---

[4] "[R]eservation of jurisdiction over a detail like
overseeing the precise amount of back pay owed does not affect
the finality of an arbitrator's award." Burns Int'l Security,
Serv., Inc. v. Int'l Union, 47 F.3d 14, 16 (2d Cir. 1995) (citing
Dreis & Krump Mfg. Co., 802 F.2d at 250).  "[T]he arbitrator's
retention of jurisdiction to settle disputes regarding
implementation of the award is not a sufficient reason to vacate
the award, as retaining such jurisdiction does not detract from
the finality of his conclusion." Cuna Mutual Ins. Soc'y v. Office
& Prof. Employees Int'l Union, Local 39, No. 04-C-138-C, 2004 WL
2713088, at *9 (W.D. Wis., Nov. 29, 2004).

_officio_ and lacks any power to reexamine that decision." <u>United</u>
<u>Mineworkers of Am. v. Sunnyside Coal Co.</u>, 841 F. Supp. 382, 388
(D. Utah, 1994) (<u>quoting</u> <u>Colonial Penn Ins. Co. v. Omaha Indem.</u>
<u>Co.</u>, 943 F.2d 327, 331 (3d Cir. 1991)).

    The Arbitrator's retention of jurisdiction here does not
render his award not final, because his purpose in retaining
jurisdiction was to settle potential accounting disputes arising
from how many extra payments were made by Haven into the Pension
Fund during the period in dispute.  Since the award answered
completely the issues brought before the Arbitrator, this
extension of jurisdiction does not affect the finality of the
determinations in his award.

## IV. CONCLUSION

    For the foregoing reasons, plaintiff's Motion to Vacate
Arbitration Award [Doc. # 1] is DENIED and this case will be
closed.

IT IS SO ORDERED

_____/s/_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 25th day of August, 2006.**

12